1  Kristin A. Zilberstein, Esq. (SBN: 200041)
   Jennifer R. Bergh, Esq. (SBN 305219)
2  LAW OFFICES OF MICHELLE GHIDOTTI
3  1920 Old Tustin Ave
   Santa Ana, CA 92705
4
   Ph:  (949) 427-2010
5  Fax: (949) 427-2732
6  kzilberstein@ghidottilaw.com
7  Attorney for Secured Creditor
8  Bosco Credit, LLC
9
10              UNITED STATES BANKRUPTCY COURT
11              NORTHERN DISTRICT OF CALIFORNIA
12                     OAKLAND DIVISION
13  In Re:                          )   CASE NO.:  16-42900
14                                  )
    JAVAN & TAWANA DEVORE           )   CHAPTER 13
15                                  )
16                                  )   RS No.: MRG-100
          Debtors.                  )
17                                  )   **DECLARATION IN SUPPORT OF**
                                    )   **MOTION FOR RELIEF FROM**
18                                  )   **AUTOMATIC STAY**
19                                  )
                                    )   Date:  July 27, 2018
20                                  )   Time: 10:00 a.m.
                                    )   Ctrm: 215
21                                  )   Place: 1300 Clay Street, Oakland, CA 94612
                                    )
22                                  )
                                    )   Judge: Charles Novack
23                                  )
                                    )
24                                  )
                                    )
25                                  )
                                    )
26 _____  )
27
28

I, _Cinci D'Elia_, declarte and state as follows:

1. I am over the age of eighteen years and not a party to this action. The facts set for the below are known to me personally based upon the review of the business records and I have first-hand knowledge of them. If called as a witness, I could and would testify competently under oath to such facts.

2. I am employed by Franklin Credit Management Corporation, which services the loan on behalf of Secured Creditor Bosco Credit LLC and am familiar with the subject Deed of Trust and loan in favor of Bosco Credit LLC ("Secured Creditor" herein), and the subject Bankruptcy case.

3. I am familiar with the manner and procedure by which the records of Secured Creditor are obtained, prepared, and maintained. Those records are obtained, prepared, and maintained by employees or agents of Secured Creditor in the performance of their regular business duties at or near the time, act, conditions, or events recorded thereon. The records are made either by persons with knowledge of the matters they record or from information obtained by person with such knowledge. It is my business practice to maintain these records in the regular course of business.

4. Secured Creditor has been responsible for the handling of all matters relative to the underlying loan prior to the filing of the within motion, including but not limited to processing of all payments received, crediting of received payments, adding all proper charges to the loan, confirming the maintenance of hazard insurance and property taxes, property preservation where appropriate, communicating with and responding to the borrower on all matters relative to the loan, and the commencement of non-judicial foreclosure proceedings where appropriate. All activities on the loan advanced by Secured Creditor were advanced in accordance with the terms of the Note, Deed of Trust, and any Forebearance/Modification Change of Terms Agreement.

////

5. The subject real property securing the Deed of Trust loan is commonly known as 3904 Hidden Grove Lane, Concord, CA 94519, and legally described as set forth therein. A true and correct copy of the Deed of Trust is attached to the Motion as **Exhibit "1"**.

6. Furthermore, Secured Creditor is the holder and in possession of the original Promissory Note (titled Home Equitey Line of Credit Agreement and Disclosure Statement) dated 6/29/2006 in the principal amount of $77,922.00 which is Secured by the Variable Interest Rate Revolving Line of Credit Deed of Trust agreement of the same date. A true and correct copy of the Note is attached to the Motion as **Exhibit "2"**.

7. The Debtor filed this subject bankruptcy petition 10/18/2016.

8. Pursuant to the terms of the Note and/or Variable Interest Rate Revolving Line of Credit Deed of Trust agreement, a payment received is applied to the account and credited to the next due payment. For example, a payment received in December will be applied to the November payment if no payment had been received in November.

9. A true and correct copy of all assignment(s) are attached as **Exhibit "3"**.

10. A true and correct copy of a post-petition payment history is attached as **Exhbit "4"**.

11. With respect to Secured Creditor's Deed of Trust as of 5/31/2018, the following is now due:

Monthly payments:

| | | | | |
|---|---|---|---|---|
| 1 payment due 10/20/16 | at | $1,785.85 | $ | 1,785.85 |
| 1 payment due 11/20/16 | at | $1,806.19 | $ | 1,806.19 |
| 1 payment due 12/20/16 | at | $1,785.85 | $ | 1,785.85 |
| 1 payment due 1/20/17 | at | $1,809.13 | $ | 1,809.13 |
| 1 payment due 2/20/17 | at | $1,824.79 | $ | 1,824.79 |
| 1 payment due 3/20/17 | at | $1,761.97 | $ | 1,761.97 |
| 1 payment due 4/20/17 | at | $1,827.44 | $ | 1,827.44 |
| 1 payment due 5/20/17 | at | $1,819.75 | $ | 1,819.75 |
| 1 payment due 6/20/17 | at | $1,841.22 | $ | 1,841.22 |
| 1 payment due 7/20/17 | at | $1,822.45 | $ | 1,822.45 |
| 1 payment due 8/20/17 | at | $1,857.96 | $ | 1,857.96 |
| 1 payment due 9/20/17 | at | $1,857.96 | $ | 1,857.96 |
| 1 payment due 10/20/17 | at | $1,725.90 | $ | 1,725.90 |
| 1 payment due 11/20/17 | at | $1,857.96 | $ | 1,857.96 |
| 1 payment due 12/20/17 | at | $1,835.95 | $ | 1,835.95 |

Motion for Relief Declaration

16-42900

| | | | | |
|---|---|---|---|---|
| 1 payment due 1/20/18 | at | $1,860.66 | $ | 1,860.66 |
| 1 payment due 2/20/18 | at | $1,874.70 | $ | 1,874.70 |
| 1 payment due 3/20/18 | at | $1,807.05 | $ | 1,807.05 |
| 1 payment due 4/20/18 | at | $1,761.95 | $ | 1,761.95 |
| 1 payment due 5/20 18 | at | $1,868.05 | $ | 1,868.05 |

| | | |
|---|---|---|
| Bankruptcy Attorney Fee: | $ | 850.00 |
| Bankruptcy Filing Fee: | $ | 181.00 |
| **Total Delinquencies:** | **$** | **37,423.78** |

12.    The sums set forth in this declaration do not include any late charges, escrow advances, or other fees and charges that might otherwise be included in the event that a payoff is requested or provided.

13.    The next scheduled monthly payment of $1,891.13 is due 6/20/2018, and continuing each month thereafter.  However, this amount may be subject to change pursuant to the terms of the applicable loan documents.  Late charges will accrue if the payments are not recived by the 20th of the month.

I declare under penalty of perjury under the laws of the Unted States of America that the foregoing is true and correct.

Executed on __July 2018__ (Date) __Jersey City__ (City), __NJ__ (State)

_____
Signature

_____
Print Name

Case: 16-42900    Doc# 63-2    Filed: 07/11/18    Entered: 07/11/18 11:02:19    Page 4 of 40

# EXHIBIT "1"

RECORDING REQUESTED BY
ALLIANCE TITLE CO.
ESCROW# REDACTED

AFTER RECORDING RETURN TO:

CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
**DOC- 2006-0217826-00**

Acct 15- Alliance Title Company
Tuesday, JUL 11, 2006 08:00:00
MIC     $1.00 MOD     $20.00 REC     $24.00
TCF    $19.00 DAF      $1.80 REF      $0.20

Ttl Pd  $66.00          Nbr-0003317320
                            dar/R2/1-20

PREPARED BY:
NICOLE VILLEGAS

CAL STATE 9 CREDIT UNION

2300 CLAYTON ROAD, #220

CONCORD, CA 94520

---

[Space Above This Line For Recording Data]

## VARIABLE INTEREST RATE REVOLVING LINE OF CREDIT
## DEED OF TRUST

DEVORE
LOAN #:
PIN:

**DEFINITIONS**
(A) "Security Instrument" means this document, which is dated  JUNE 29, 2006
together with all riders to this document.
(B) "Borrower" is TAWANA J. DEVORE, A MARRIED WOMAN AS HER SOLE AND SEPARATE
PROPERTY

Borrower is the trustor under this Security Instrument.
(C) "Lender" is CAL STATE 9 CREDIT UNION

Lender is a **CREDIT UNION**                                    , organized and existing under the laws of the
State of                                         . Lender's address is 2300 CLAYTON RD # 220,
CONCORD, CA 94527-1768
Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is CAL STATE 9 CREDIT UNION

(E) "Secured Indebtedness" means:

THE DEED OF TRUST IS SECOND AND SUBORDINATE
TO A DEED OF TRUST IN FAVOR OF *World Savings*
IN THE AMOUNT OF $ *624,000*
RECORDING CONCURRENTLY HEREWITHIN.

     (1) The debt, interest, finance charges, and other fees and charges incurred under the terms of the Home
     Equity Line of Credit Agreement and Disclosure Statement ("HELOC") dated
     JUNE 29, 2006           ; the HELOC matures on JULY 20, 2031
     (2) Any advance made to Borrower or obligation incurred by Borrower pursuant to any contract or
     evidence of indebtedness benefiting Lender, regardless of whether such advance has been made or such
     obligation has been incurred in whole or in part as of the date of this Security Instrument.

**CALIFORNIA HELOC Deed of Trust**          Page 1 of 10                              **9/01**
DOCUEBW1                                                                          **CALOCRS**
DOCUEBW1.VTX  09/21/2005



Case: 16-42900   Doc# 63-2   Filed: 07/11/18   Entered: 07/11/18 11:02:19   Page 6 of 40

(3) Any sum paid and expense incurred by Lender under the terms of this Security Instrument.

**(F) "Credit Limit** means the maximum aggregate amount of principal that may be secured by this Security Instrument at any one time. The Credit Limit is **$77,922.00** . Except to the extent prohibited by Applicable Law, the Credit Limit does not apply to interest, finance charges, and other fees and charges validly incurred by Borrower under this Security Instrument. The Credit Limit also does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

**(H) "Riders"** means all riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☒ Planned Unit Development Rider ☐ Biweekly Payment Rider
☒ 1-4 Family Rider ☐ Other(s) [specify]

**(I) "Applicable Law"** means all controlling applicable federal, state, and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as applicable final, non-appealable judicial opinions.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Secured Indebtedness, and all renewals, extensions, and modifications of the Secured Indebtedness; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the HELOC. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY of **CONTRA COSTA** :

Assessor's Identification Number _____
*[Add if LOS ANGELES County]*
**SEE ATTACHED EXHIBIT A--LEGAL DESCRIPTION OF REAL PROPERTY, WHICH IS ATTACHED TO THIS DEED**

which currently has the address of **3904 HIDDEN GROVE LANE**
[Street]
**CONCORD** , CALIFORNIA **94519** ("Property Address"):
[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions also shall be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and shall defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

## ADVANCES

Any advances made under the HELOC may be made, repaid, and remade from time to time, subject to the limitations of the HELOC. Regardless of whether the Secured Indebtedness is reduced to a zero balance, this Security Instrument shall remain in effect until released or reconveyed.

CALIFORNIA HELOC Deed of Trust Page 2 of 10 9/01
DOCUEBW2 CALOCRS
DOCUEBW2.VTX 09/21/2005

Case: 16-42900 Doc# 63-2 Filed: 07/11/18 Entered: 07/11/18 11:02:19 Page 7 of 40

Any advances made in excess of the Credit Limit shall not be secured by this Security Instrument if prohibited by Applicable Law or, if not prohibited by Applicable Law, unless (i) Lender agrees to increase the Credit Limit and complies with any subsequent disclosure, rescission, and other requirements under Applicable Law and (ii) Borrower agrees to execute any documents Lender requires to evidence and secure the increase in the Credit Limit. Lender shall not be obligated in any way under this Security Instrument to increase the Credit Limit or to make additional or future loans or advances in any amount.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

**1.** **Payment of Secured Indebtedness; Performance of Obligations.** Borrower shall pay when due the Secured Indebtedness and shall perform all of Borrower's obligations under the HELOC and this Security Instrument.

**2.** **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property that can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and the dues, fees, and assessments of a condominium association, homeowners association, or similar organization, if any.

Borrower shall make all payments and comply with all covenants as and when required by any mortgage, deed of trust, security agreement, or other lien document evidencing a lien that is prior to this Security Instrument and that is approved by Lender. Borrower shall not modify, extend, or increase the amount secured by such prior lien document without Lender's written consent.

Upon demand Borrower shall furnish to Lender satisfactory evidence of payment of such taxes, assessments, charges, fines, impositions, and prior liens.

Borrower shall promptly discharge any lien not approved by Lender that has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings that in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien that can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 2.

**3.** **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against fire, hazards included within the term "extended coverage," flood, and any other hazards including without limitation earthquakes, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences may change during the term of the HELOC. Borrower may obtain such insurance from the insurance carrier of Borrower's choice, subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard, or liability, and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 3 shall be Secured Indebtedness and shall be payable according to the terms of the HELOC.

CALIFORNIA HELOC Deed of Trust         Page 3 of 10         9/01
DOCUEBW3                                                      CALOCRS
DOCUEBW3.VTX   09/21/2005

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the Secured Indebtedness, whether or not then due, with the excess, if any, paid to Borrower.

4. **Preservation, Maintenance, and Protection of the Property; Occupancy and Use of the Property; and Inspection.** Borrower shall not destroy, damage, or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value, due to its condition, such as would adversely affect Lender's security in the Property. Unless it is determined pursuant to Section 3 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower shall not be relieved of Borrower's obligation for the completion of such repair or restoration.

Borrower shall not materially change the present occupancy and use of the Property without Lender's written consent. Borrower shall not use the Property in an illegal manner or for any illegal use such as would subject the Property to seizure.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

5. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien that may attain priority over this Security Instrument, or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions may include, but are not limited to: (a) paying any sums secured by a lien that has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including Lender's secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up

CALIFORNIA HELOC Deed of Trust  Page 4 of 10  9/01
DOCUEBW4  CALOCRS
DOCUEBW4 .VTX  09/21/2005

doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 5, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 5.

Any amounts disbursed by Lender under this Section 5 shall be Secured Indebtedness and shall be payable according to the terms of the HELOC.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing. If the Property is located in a condominium project or a planned unit development, Borrower shall perform all of Borrower's obligations under the covenants, by-laws, or regulations of the condominium project or planned unit development.

6. **Condemnation.** Borrower shall give Lender prompt notice of any condemnation or eminent domain proceeding or action pending or threatened against the Property and authorizes Lender to intervene in Borrower's name in any such proceeding or action. Borrower assigns to Lender any money awarded to Borrower pursuant to such proceeding or action, and such money shall be applied to the Secured Indebtedness, whether or not then due, with the excess, if any, paid to Borrower.

7. **Loan Charges.** If the HELOC is subject to a law that sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the HELOC exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower that exceeded permitted limits shall be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the HELOC or by making a direct payment to Borrower. If a refund reduces principal, the reduction shall be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the HELOC). Borrower's acceptance of any such refund made by direct payment to Borrower shall constitute a waiver of any right of action Borrower might have arising out of such overcharge.

8. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement shall satisfy the corresponding requirement under this Security Instrument.

9. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. In the event that any provision or clause of this Security Instrument or the HELOC conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the HELOC that can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

10. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the HELOC (a "co-signer"): (a) is co-signing this Security

**CALIFORNIA HELOC Deed of Trust**      Page 5 of 10      9/01
DOCUFBW5
DOCUFBW5.VTX 09/21/2005      CALOCRS

Case: 16-42900    Doc# 63-2    Filed: 07/11/18    Entered: 07/11/18 11:02:19    Page 10 of 40

Instrument only to mortgage, grant, and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear, or make any accommodations with regard to the terms of this Security Instrument or the HELOC without the co-signer's consent.

Subject to the provisions of Section 11, any successor to the interests of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender.

**11.     Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 11, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of the Secured Indebtedness. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 8 within which Borrower must pay the Secured Indebtedness in full. If Borrower fails to pay the Secured Indebtedness in full prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**12.     Hazardous Substances.** As used in this Section 12: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety, or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, or allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) that creates an Environmental Condition, or (c) that, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower promptly shall give Lender written notice of (a) any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release, or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use, or release of a Hazardous Substance that adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority or any private party that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**13.     Escrow for Taxes and Insurance.** Unless otherwise provided in a separate agreement, Borrower shall not be required to pay in escrow to Lender funds for taxes, insurance, and other assessments.

**14.     Default.** Borrower shall be in default under the HELOC and this Security Instrument if without limitation any of the following occur: (a) Borrower engaged or engages in fraud or material misrepresentation in

CALIFORNIA HELOC Deed of Trust                     Page 6 of 10                                          9/01
DOCU8W6                                                                                                 CALOCRS
DOCU8W6.VTX   08/21/2005

Case: 16-42900     Doc# 63-2     Filed: 07/11/18     Entered: 07/11/18 11:02:19     Page 11 of 40

217826

connection with any aspect of the HELOC or this Security Instrument, including without limitation Borrower's application for the HELOC and Borrower's occupancy of the Property; (b) Borrower does not meet repayment terms under the HELOC; (c) Borrower's action or inaction adversely affects the collateral for the HELOC (including without limitation the Property) or Lender's rights in the collateral including without limitation: (i) Borrower's failure to maintain the insurance required under Section 3 of this Security Instrument; (ii) Borrower's transfer of the Property as provided in Section 11 of this Security Instrument; (iii) Borrower's failure to maintain the Property or use of the Property in a destructive manner; (iv) Borrower's commission of waste of the Property; (v) Borrower's failure to pay taxes due on the Property or Borrower's failure to act such that a lien superior to Lender's lien is filed against the Property; (vi) the death of all Borrowers; (vii) the Property is taken by condemnation or eminent domain; (viii) a judgment is filed against Borrower that subjects the Property to action that adversely affects Lender's interest in the Property; (ix) the creation of a lien on the Property without Lender's permission; or (x) a superior lien holder forecloses on the Property such that Lender's interest in the Property is adversely affected.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**15. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 11 unless Applicable Law provides otherwise). The notice shall comply with Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of the Secured Indebtedness without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 15, including without limitation reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give or cause Trustee to give all notices required by Applicable Law in the time and manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property to the highest bidder at public auction at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale. Trustee shall deliver to the purchaser Trustee's deed conveying the Property without covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including without limitation reasonable Trustee's and attorneys' fees; (b) to the Secured Indebtedness; and (c) any excess to the person or persons legally entitled to it.

If Borrower is in default, Lender may elect not to accelerate the Secured Indebtedness but instead may refuse to make additional advances or reduce the Credit Limit. Even if Lender elects not to exercise any remedy under this Security Instrument, Lender does not forfeit or waive Lender's right to do so at a later time or to do so if Borrower is in default again.

**16. Reconveyance.** Upon payment in full of the Secured Indebtedness, Lender shall request Trustee to reconvey the Property and surrender this Security Instrument and all documents evidencing the Secured Indebtedness to Trustee. Lender shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**17. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee, and Borrower, the book and page where this Security Instrument is recorded, and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall

Case: 16-42900    Doc# 63-2    Filed: 07/11/18    Entered: 07/11/18 11:02:19    Page 12 of 40

217826

succeed to all the title, powers, and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**18.** **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

**19.** **Property Insurance.** The third paragraph of Section 3 is revised to read as follows; all other terms and provisions shall remain unchanged.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee, and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the HELOC up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee, and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the HELOC up to the amount of the outstanding loan balance.

Case: 16-42900    Doc# 63-2    Filed: 07/11/18    Entered: 07/11/18 11:02:19    Page 13 of 40

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Riders executed by Borrower and recorded with it. Borrower also acknowledges receipt of a copy of this Security Instrument.

— BORROWER — TAWANA J. DEVORE — DATE —

CALIFORNIA HELOC Deed of Trust
DOCUEBW9
DOCUEBW9.VTX  09/21/2005

Page 9 of 10

9/01
CALOCRS

217826

----------------------------[Space Below This Line For Acknowledgment]----------------------------

State of Ca
County of San Mateo                          ) ss
                                             ) ss

On 6/30/06          , before me, C. B. Sarmiento, Notary Public
a Notary Public, personally appeared

Tawana J. Devore

☐ personally known to me

**OR**

☑ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in her/his/their authorized capacity, and that by her/his/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

[Seal]

C. B. SARMIENTO
Comm. No. 1389840
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
My Comm. Expires Jan. 10, 2007

_____
Notary Public

C. B. Sarmiento
_____
(Printed Name)

My commission expires: 1/10/07

**CALIFORNIA HELOC Deed of Trust**
DOCUEBW10
DOCUEBMA.VTX 09/21/2005

Page 10 of 10

9/01
**CALOCRS**

Case: 16-42900   Doc# 63-2   Filed: 07/11/18   Entered: 07/11/18 11:02:19   Page 15 of 40

217826

## ADJUSTABLE RATE RIDER
### (Prime Rate Index — Maximum Rate Cap)

DEVORE
LOAN #:

THIS ADJUSTABLE RATE RIDER is made **JUNE 29, 2005** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Cal State 9 Credit Union (the "Lender") of the same date and covering the property described in Security Instrument and located at:
**3904 HIDDEN GROVE LANE, CONCORD, CA 94519**

[Property Address]

THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE MAXIMUM RATE THE BORROWER MUST PAY.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

### INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for an initial interest rate of **14.000** %. The Note provides for changes in the interest rate and the monthly payments as follows:

**(1)   Change Dates**
The interest rate I will pay may change quarterly on the first day of January, April, July and October. Each date on which my interest rate could change is called a "Change Date"

**(2)   The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the Prime Rate published in the Money Rates column of *The Wall Street Journal*. When a range of rates has been published the lowest rate will be used. The most recent Index figure available as of the last business day of the month prior to the most recent Change Date is called the "Current Index."

**(3)   Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding **6.000** to the Current Index. Subject to the limits stated in Section A(4) below, this amount will be my new interest rate until the next Change Date.

DOCUFW51
DOCUFW51.VTX 04/12/2005

Page 1 of 2

Case: 16-42900   Doc# 63-2   Filed: 07/11/18   Entered: 07/11/18 11:02:19   Page 16 of 40

217826

**(4)    Limits on Interest Rate Changes**

There is no limit on the amount by which the interest rate may change at any Change Date or during any one-year period. The maximum interest rate that can apply is 18.000% or the maximum permitted by law, whichever is less.

**(5)    Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(6)    Notice of Changes**

If you have a balance owing on your HELOC or have any account activity, you will be sent a periodic statement. Your statement will identify the Effective Interest Rate for your Note, the Minimum Payment you must make for that billing period, and the date it is due. Your statement will also include the telephone number of a person who will answer any questions you may have.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

- BORROWER - TAWANA J. DEVORE - DATE -

6/38/06

## 1-4 FAMILY RIDER
### (Assignment of Rents)

DEVORE
LOAN #:

THIS 1-4 FAMILY RIDER is made this **29TH** day of **JUNE, 2006** , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to **CAL STATE 9 CREDIT UNION**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: **3904 HIDDEN GROVE LANE, CONCORD, CA 94519**

[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT.** In addition to the Property described in the Security Instrument, the following items now or hereafter attached to the Property to the extent they are fixtures are added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

MULTISTATE 1-4 FAMILY RIDER
DOCUIXX1
DOCUIXX1.VTX 09/20/2005

*(Page 1 of 3)*

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classification, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 15 is deleted.

**F. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**G. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time

Case: 16-42900   Doc# 63-2   Filed: 07/11/18   Entered: 07/11/18 11:02:19   Page 19 of 40

when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

    **H. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

_____  6/20/06

  – BORROWER – TAWANA J. DEVORE – DATE –

MULTISTATE 1-4 FAMILY RIDER
DOCUHXX3
DOCUHXX3.VTX  09/20/2005           *(Page 3 of 3)*

# PLANNED UNIT DEVELOPMENT RIDER

DEVORE
LOAN #:

THIS PLANNED UNIT DEVELOPMENT RIDER is made this **29TH** day of **JUNE 2006**,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security
Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure
Borrower's Note to **CAL STATE 9 CREDIT UNION**

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
**3904 HIDDEN GROVE LANE, CONCORD, CA 94519**

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such
parcels and certain common areas and facilities, as described in
**THE COVENANTS, CONDITIONS AND RESTRICTIONS FILED OF RECORD THAT AFFECT THE
PROPERTY.**

(the "Declaration"). The Property is a part of a planned unit development known as

**HIDDEN GROVE**

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity
owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses,
benefits and proceeds of Borrower's interest.

     **PUD COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

     **A.   PUD Obligations.** Borrower shall perform all of Borrower's obligations under the
PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii)
articles of incorporation, trust instrument or any equivalent document which creates the Owners

**MULTISTATE PUD RIDER**--Single Family
DOCUHXW1
DOCUHXW1.VTX 09/20/2005

*(page 1 of 3 pages)*

Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 6.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

MULTISTATE PUD RIDER--Single Family
DOCUHDXW2
DOCUHDM2 .VTX   09/20/2005                    *(page 2 of 3 pages)*

217826

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

— BORROWER — TAWANA J. DEVORE — DATE —

**MULTISTATE PUD RIDER**–Single Family
DOCUIDW3
DOCUIDW3.VTX  09/20/2005

*(page 3 of 3 pages)*

217826

CAL STATE· 9 CREDIT UNION
2300 CLAYTON ROAD, #220, CONCORD, CA 94520

## SIGNATURE/NAME AFFIDAVIT

LOAN NUMBER:

DATE: JUNE 29, 2006

LOAN #:

BORROWER(S): TAWANA J. DEVORE

THIS IS TO CERTIFY THAT MY LEGAL SIGNATURE IS AS WRITTEN AND TYPED BELOW. (This signature must <u>exactly</u> match signatures on the Note and Mortgage or Deed of Trust.)

TAWANA J. DEVORE
_____
(Print or Type Name)

Signature
TAWANA J. DEVORE

(If applicable, complete the following.)

I hereby certify that :

are one in the same person.

Date:   JUNE 29, 2006

Signature
TAWANA J. DEVORE

State of/Commonwealth of CA                                              San Mateo   County

On this 30th day of June, 2006 , before me, the undersigned, a Notary Public in and for said State, personally appeared TAWANA J. DEVORE known to me, or proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

Signature _____

My Commission Expires: 1/10/07

C. El SARMIENTO
Comm. No. 1389840
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
My Comm. Expires Jan.10, 2007

DOCUNCV
DOCUNCV.VTX 05/24/2005

217826

**Exhibit "A"**
**Legal Description**

All that certain real property in the City of Concord, County of Contra Costa, State of California, described as follows:

Lot 40 as shown on that certain Map entitled "Subdivision 8753, Hidden Grove", filed in the Office of the Recorder of the County of Contra Costa, State of California on August 20, 2004 in Book 468 of Maps, Pages 1 through 5, inclusive.

END OF DOCUMENT

legal rev. (010698)

# EXHIBIT "2"


CERTIFIED TO BE A TRUE
AND CORRECT COPY
Alliance Title Company
By: _____

# HOME EQUITY LINE OF CREDIT AGREEMENT
## AND DISCLOSURE STATEMENT

DEVORE
LOAN #:

| JUNE 29, 2006 | **FREMONT** | | **CALIFORNIA** |
|---|---|---|---|
| [Date] | | [Title City] | [Title State] |

3904 HIDDEN GROVE LANE, CONCORD, CA 94519

[Property Address]

| Credit Limit | $ 77,922.00 | Draw Period | 120 MONTHS |
|---|---|---|---|
| Initial Advance | $ 77,922.00 | Repayment Period | 180 MONTHS |
| Minimum Advance | $ 500.00 | Minimum Balance $ | 0.00 |
| Margin | 6.000 % | | |

Initial ANNUAL PERCENTAGE RATE ___14.000___ %

☒ **Initial Rate Not Discounted.** The Daily Periodic Rate is 0.0384 %, which corresponds to the Initial ANNUAL PERCENTAGE RATE indicated above. The **ANNUAL PERCENTAGE RATE** may change and will be determined by adding the Margin described above to the Index (as defined in Section 1 below).

**1. DEFINITIONS:**

    (A) "Agreement" means this document.

    (B) "You" or "Your" is TAWANA J. DEVORE

Your address is 3904 HIDDEN GROVE LANE, CONCORD, CA 94519

    (C) "Lender" is CAL STATE 9 CREDIT UNION

Lender's address is 2300 CLAYTON ROAD, #220, CONCORD, CA 94520

    (D) "Holder" is Lender or any person or entity who takes this Agreement by transfer and is entitled to receive payments under this Agreement.

    (E) "Account" means your home equity line of credit account with Holder.

    (F) "Loan" or "Loans" means any money advanced to you by Holder when you access the Account.

    (G) "Credit Limit" means the maximum aggregate amount of principal of the Loans that Holder will allow you to owe under this Agreement, unless otherwise agreed. **The Credit Limit is indicated above.**

    (H) "Account Balance" means the total of the unpaid principal of the Loans, plus earned but unpaid FINANCE CHARGES, fees, and credit insurance premiums.

    (I) "Minimum Balance" means the minimum amount of principal of all Loans that you must maintain under the Account. **The Minimum Balance is indicated above.**

    (J) "Initial Advance" means the minimum amount of the Loan that you must accept to open the Account. **The Initial Advance is indicated above.**

    (K) "Minimum Advance" means the minimum amount of a Loan that you must request by any means other than the credit card or cards that Holder furnishes to you to make purchases or receive advances ("Credit Card"). **The Minimum Advance is indicated above.**

    (L) "Draw Period" means the period of time during which you may request Loans and must make payments on your Account Balance. **The Draw Period is indicated above.**

    (M) "Repayment Period" means the period of time beginning at the end of the Draw Period during which you no longer may request Loans and must repay the Account Balance. **The Repayment Period is indicated above.**

    (N) "Billing Statement" means a statement furnished by Holder each Billing Cycle (as defined in subsection (O) below) that shows, among other things, Loans, FINANCE CHARGES, other charges, payments made, other

Case: 16-42900    Doc# 63-2    Filed: 07/11/18    Entered: 07/11/18 11:02:19    Page 27 of 40

credits, the previous Account Balance, the current Account Balance, and the required payment for the Account during the Billing Cycle.

(O) "**Billing Cycle**" means the regular period or interval between the days or dates of the Billing Statements during which **FINANCE CHARGES** accrue and that will be used to determine the amount of your payment and when your payment is due. The Billing Cycle is **monthly**.

(P) "**Index**" means the lowest base rate on corporate loans at large U.S. money center commercial banks that *The Wall Street Journal* publishes as the prime rate.

## 2. OPENING YOUR ACCOUNT

The Account will be opened when you have signed and delivered in acceptable form all documents considered necessary by Holder and Holder makes the Initial Advance to you. Each of you who signs this Agreement is jointly and individually obligated to keep all of the promises made in this Agreement, and, as such, Holder may require any of you to pay all amounts due under this Agreement. Each of you agrees not to give Holder conflicting instructions under this Agreement.

## 3. ACCESSING YOUR ACCOUNT

You may access the Account after any right you have to cancel this Agreement expires and all of Holder's conditions have been met. You may access the Account initially only for an amount equal to or greater than the Initial Advance. Thereafter, you may access the Account only for an amount equal to or greater than the Minimum Advance. Holder at Holder's option may without obligation make a Loan in an amount that is less than the Minimum Advance; by doing so, however, Holder does not waive the right to later refuse to make such a Loan.

You may access the Account by: (a) writing a check using one of the checks that Holder furnishes to you ("Checks"); (b) authorizing Holder to pay a third party or account; or (c) any other method acceptable to Holder. Each of you who signs this Agreement may access the Account jointly or individually, and Holder may rely on instructions from any one of you with regard to this Agreement.

You may not use any Loan provided by Holder to make payments on the Account. In addition, Holder reserves the right not to honor a Check under the following circumstances: (a) the Check is post-dated (if a post-dated Check is paid and as a result any other Check is returned, Holder will not be responsible); (b) a Check or Checks have been reported lost or stolen; (c) the Check is not signed by one of you; or (d) the Account has been terminated or suspended as provided in this Agreement or can be so terminated or suspended if Holder pays the Check. Dishonor of a Check by Holder for any reason provided in this Agreement will not constitute wrongful dishonor. Holder's liability otherwise for wrongful dishonor, if any, of a Check is limited to your actual damages.

## 4. AVAILABILITY OF LOANS

You may access the Account and receive a Loan during the Draw Period, subject to the provisions of this Agreement. Holder at Holder's option may extend the Draw Period. During the Draw Period, you may borrow against the Account, repay any portion of the Account Balance, and re-borrow such portions up to the Credit Limit.

You may not access the Account so as to cause the Account Balance to exceed the Credit Limit. However, Holder at Holder's option may make a Loan that causes the Account Balance to exceed the Credit Limit; by doing so, however, Holder does not waive the right to later refuse to make such a Loan. If Holder agrees to make a Loan that causes the Account Balance to exceed the Credit Limit, you agree to execute additional security documents.

## 5. FINANCE CHARGES

In addition to the amount of any Loans made to you, you agree to pay Holder a **FINANCE CHARGE** ("**FINANCE CHARGE**" or "**FINANCE CHARGES**") on the Account Balance. The Account Balance for each day is determined by taking the Account Balance at the beginning of that day and (a) subtracting any unpaid **FINANCE CHARGE**, fees, and credit insurance premiums that are due; (b) subtracting the portion of any payments or credits received by Holder that day that apply to the repayment of the Loans; and (c) adding any Loans made that day.

The **FINANCE CHARGE** on a Loan begins to accrue immediately from the time Holder makes the Loan to you. There is no "free ride period" during which **FINANCE CHARGES** will not accrue.

The **FINANCE CHARGE** is determined for each day by applying a daily periodic rate ("Daily Periodic Rate") to the Account Balance for that day; the Daily Periodic Rate is 1/365th of the **ANNUAL PERCENTAGE RATE** applicable to that day. The total **FINANCE CHARGE** for each Billing Cycle is determined by adding together the **FINANCE CHARGE** for the actual number of days during the Billing Cycle.

The Initial **ANNUAL PERCENTAGE RATE** is indicated on the first page of this Agreement. The manner in which the **ANNUAL PERCENTAGE RATE** will change will be determined by the box marked on the first page of this agreement.

The **ANNUAL PERCENTAGE RATE** will increase or decrease if the Index increases or decreases; the corresponding increase or decrease in the Daily Periodic Rate will be determined as described above. An increase or

Case: 16-42900    Doc# 63-2    Filed: 07/11/18    Entered: 07/11/18 11:02:19    Page 28 of 40

decrease in the **ANNUAL PERCENTAGE RATE** will result in a corresponding increase or decrease in the **FINANCE CHARGE** and may result in a corresponding increase or decrease in your monthly payment. The Index may change daily; however, the Index in effect on the day the **ANNUAL PERCENTAGE RATE** is adjusted will be used to determine the new **ANNUAL PERCENTAGE RATE**. We will use the most recent index value available to us as of the last business day of the month prior to an **ANNUAL PERCENTAGE RATE** change. Any change in the **ANNUAL PERCENTAGE RATE** will take effect on the first day of each calendar quarter.

The **ANNUAL PERCENTAGE RATE** can change quarterly on the first day of January, April, July, and October. There is no limit on the amount by which the **ANNUAL PERCENTAGE RATE** can change during any one year period. The **ANNUAL PERCENTAGE RATE** will never exceed the lesser of 18.00% or the highest allowable rate for this type of Agreement as determined by applicable state or federal law ("Maximum **ANNUAL PERCENTAGE RATE**"). The **ANNUAL PERCENTAGE RATE** includes only interest and no other costs.

## 6. PAYMENTS

You promise to pay to Holder any amounts owed under this Agreement as follows:

**(A) Draw Period**

During the Draw Period, no later than the payment date specified in your Billing Statement, you must pay at least the Minimum Monthly Draw Period Payment. The "Minimum Monthly Draw Period Payment" is the greatest of: (1) the amount of accrued **FINANCE CHARGES**; or (2) $75.00.

**(B) Repayment Period**

During the Repayment Period, no later than the payment date specified in your Billing Statement you must pay at least the "Minimum Monthly Repayment Period Payment". The Minimum Monthly Repayment Period Payment is the greater of: (1) an amount equal to 1.5% of your Account Balance or (2) $75.00.

During the Draw and Repayment Periods, in no event will the minimum monthly payment fall below $75.00. If the Account Balance is less than $75.00, you must pay it in full.

The required minimum payment may not repay the outstanding balance by the end of the repayment period. If this happens, you will be required to make a single balloon payment at the end of the repayment period. Unless otherwise required by applicable law, we are under no obligation to refinance the balloon payment at that time. You may be required to make payments out of other assets you own or find a lender (which may or may not be us) willing to lend you the money. If you refinance the balloon payment with us, you may have to pay some or all of the closing costs.

## 7. FEES AND CHARGES

You agree to pay the following additional fees and charges:

**(A) Annual Charge**

An annual fee of $60.00 will be charged to your account on April 1st of each year. The annual fee will be waived when the average monthly outstanding balance for the previous 12 months was $5,000 or more. If the account has been opened for 6 months or less by April 1 of any year, no fee will be charged.

**(B) Late Charge**

Your payment will be late if it is not received by us within **10 days of the "Payment Due Date" shown on your periodic statement.** If your payment is late you may be assessed a late charge of $45.00.

**(C) Other Prepaid Finance Charges:** You will be charged the following prepaid **FINANCE CHARGES** at the time your account is opened:

Payable To Others:

| | |
|---|---|
| Mortgage Broker Fee to **REALTHEON** | $ _____ |
| Processing Fee to **REALTHEON** | $ _____ |
| Underwriting Fee to CU Funding | $ 695.00 |
| Administration Fee to CU Funding | $ 795.00 |
| Overnight Delivery Fee to CU Funding | $ 65.00 |
| Closing/Escrow Fee to | $ 224.00 |
| Doc Fee to CU Funding | $ 250.00 |

Payable To Cal State 9 Credit Union:

| | |
|---|---|
| Flood Certification | $ 15.00 |
| Tax Service Fee | $ 50.00 |
| Wire Transfer Fee to Cal State 9 Credit Union | $ 15.00 |

Case: 16-42900    Doc# 63-2    Filed: 07/11/18    Entered: 07/11/18 11:02:19    Page 29 of 40

**(D) Other Charges:** You also agree to pay the following fees and charges necessary to open your account:

Payable to Others:

| | | |
|---|---|---|
| Appraisal Fee to REALTHEON | $ | 400.00 |
| Credit Report Fee to CU Funding | $ | 13.00 |
| Notary Fees to | $ | |
| Recording Fee to | $ | 75.00 |
| Recording Request for Notice of Default | $ | 9.00 |
| Title Insurance to | $ | 360.00 |
| Document Preparation Fee to | $ | |

Payable To Cal State 9 Credit Union:

| | | |
|---|---|---|
| Lenders Documentation Review Fee | $ | 40.00 |
| Membership Fee | $ | 15.00 |

**(E) Conditions Under Which Other Charges May be Imposed.** Your agree to pay all the other fees and charges to your Credit Line as set forth below:

**Returned Items.** You may be charged $15.00 if you pay your Credit Line obligations with a check, draft, or other item that is dishonored for any reason, unless applicable law requires a lower charge or prohibits any charge.

**Fee to Stop Payment.** Your Credit Line Account may be charged $12.00 when you request a stop payment on your account.

**Miscellaneous Photocopying.** If you request a copy of any document, we may charge your Credit Line Account a Research Fee of $35.00 per hour plus Photocopy Fees of $.50 per copy whenever you request research and /or photocopies of checks or statements for purposes other than a billing error inquiry. However, if no research is required, a $3.50 per copy charge will be imposed for the time it takes us to located, copy, and mail the document to you. If your request is related to a billing error (see "Your Billing Rights" notice) and an error is found, we will reverse any photocopying charges.

**Scheduled Fee Changes.** Your Annual Membership Fee may increase annually commencing with the first anniversary of your Account by an amount not to exceed $5.00 per year. The amount of your annual fee will appear on the first periodic statement following the anniversary of your Account.

**Other Fee Increases.** The Returned Payment Fee, Stop Payment Fee and Research Fee applicable to your Account may increase annually effective August 1st of each year commencing with the first year your Account is opened. The amount of these fees will increase to the amount then in effect as reflected in the credit union's information on credit union services. You may obtain a copy of the credit union's current information or credit union's services by telephoning or sending a written request to the billing address shown on your periodic statement, or by telephoning or inquiring at the credit union office at which you opened your Account.

**Additional Security Interest Fees.** A Subordination Fee of $150.00 will be due at the time you request, and Lender agrees, to subordinate its lien in favor of a senior lienholder in order to facilitate your refinance of or additional borrowing increase to a prior lien. Lender is not obligated to agree to such a request; may deny your request to subordinate its lien; and may request that you either reduce the amount of your existing credit line or pay Lender in full for all amounts due. In addition, you may be required to pay a Beneficiary Statement Fee or a Payoff Demand Statement Fee of $25.00 as provided by Section 2943 of the California Civil Code at the time you authorize a future lender or title insurance company to obtain a statement of the condition or a statement of all amounts due under your line of credit.

**Lien Release Fees.** In addition to all other charges, you agree, to the extent not prohibited by law, to pay all fees for release of Lender's security interest in collateral securing this loan. You will pay these fees at the time the lien or liens are released. The estimated amount of these future lien release fees is $45.00.

**Other Charges.** Your Credit Line Account may be charged the following other charges: Modification Fee: A Modification Fee may be charged at the time you request a change to either the amount of your credit limit or maturity date of your line of credit. The amount of this other charge is $150.00.

Case: 16-42900    Doc# 63-2    Filed: 07/11/18    Entered: 07/11/18 11:02:19    Page 30 of 40

## 8. NOTICES

Unless applicable law requires a different method, any notice that must be given to you under this Agreement will be given by delivering it or mailing it by first class mail to the Property Address above or at a different address if you give Holder a notice of your different address. Any notice that must be given to Holder under this Agreement will be given by delivering it or mailing it by first class mail to the Holder at the address stated in Section 1(C) above or at a different address if you are given a notice of that different address.

## 9. SECURITY

The Account will be secured by a lien taken against your home pursuant to a separate Mortgage, Deed of Trust, or Security Deed ("Security Instrument") dated the same date as this Agreement. The Security Instrument requires you to take certain actions to protect your home, which is located at the address shown above ("Property"). You could lose the Property and your home if you do not meet the conditions of this Agreement or the Security Instrument. Some of the conditions of the Security Instrument are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 9 "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of the Secured Debt. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 8 within which Borrower must pay the Secured Debt in full. If Borrower fails to pay the Secured Debt in full prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

You also agree to obtain and maintain such insurance on the Property as Holder may require; you agree to maintain such insurance in the amounts and for the periods Holder requires. Unless prohibited by applicable law, the Account will be secured as well by proceeds of such insurance. You may obtain such insurance from the carrier of your choice, subject to Holder's right to disapprove your choice, which right will not be exercised unreasonably.

If you fail to keep the insurance required under this Section, Holder may obtain such insurance coverage at Holder's option and your expense, and Holder may charge you a fee to do so. Holder is under no obligation to purchase any particular type or amount of coverage; as such, you, your equity in the Property, or the contents of the Property may not be protected to the extent you desire. Any amount paid by Holder under this Section will be added as a Loan under this Agreement and be subject to the **FINANCE CHARGE.**

## 10. CREDIT AND PROPERTY INFORMATION

You agree to furnish personal financial information and information about the Property and your occupation of the Property reasonably requested by Holder from time to time. Such information must be furnished to Holder within a reasonable time but in no event later than 30 days after Holder's request. In addition, you authorize Holder, at Holder's expense, to make or have made credit inquiries, and you authorize any person to whom Holder makes such inquiries to furnish Holder with the requested information. You also authorize Holder to release information regarding the status and history of the Account to third persons, including without limitation credit bureaus, merchants, and financial institutions, to the extent permitted by applicable law.

## 11. ASSIGNMENT

Holder may assign or transfer this Agreement and the Security Instrument without notice to you. You may not assign or transfer your rights and obligations under this Agreement without Holder's written authorization; however, this Agreement is binding upon your heirs, successors, and legal representatives.

## 12. TAX DEDUCTIBILITY

You should consult a tax advisor regarding the deductibility of interest and charges under the Account.

## 13. DEFAULT

You will be in default under this Agreement if:

(A) You engage in fraud or material misrepresentation in connection with the Account or with any aspect of the Account, including without limitation your application for the Account and your occupancy of the Property;

(B) You do not meet the repayment terms under this Agreement;

Case: 16-42900    Doc# 63-2    Filed: 07/11/18    Entered: 07/11/18 11:02:19    Page 31 of 40

(C) Your action or inaction adversely affects the collateral for the Account (including without limitation the Property) or Holder's rights in the collateral under the Security Instrument, including without limitation: (i) your failure to maintain insurance as required under the Security Instrument; (ii) your transfer of the Property as provided in the Security Instrument; (iii) your failure to maintain the Property or use of the Property in a destructive manner; (iv) your commission of waste of the Property; (v) your failure to pay taxes due on the Property or your failure to act such that a lien superior to Holder's lien is filed against the Property; (vi) the death of all of you; (vii) the Property is taken by condemnation or eminent domain; (viii) a judgment is filed against you that subjects the Property to action that adversely affects Holder's interest in the Property; (ix) the creation of a lien on the Property without Holder's permission; or (x) a superior lien holder forecloses on the Property such that Holder's interest in the Property is adversely affected.

## 14. REMEDIES FOR DEFAULT

If you are in default, Holder may terminate the Account, require you to pay the entire outstanding Account Balance, and charge a termination fee and any collection fees unless otherwise prohibited from doing so by applicable law. Holder at Holder's option also may take one or more lesser actions. Such lesser actions may include without limitation reducing the Credit Limit. Holder may take action under this Section only after complying with any notice or cure provisions required under applicable law. In the event Holder elects not to terminate the Account or take lesser action when you are in default, Holder does not forfeit or waive Holder's right to do so at a later time or to do so if you are in default again.

## 15. SUSPENSION OF ACCOUNT AND REDUCTION OF CREDIT LIMIT

Unless otherwise prohibited from doing so by applicable law, Holder may temporarily suspend the Account or reduce the Credit Limit if:

(A) The value of the Property declines significantly below the Property's appraised value for purposes of the Account;

(B) Holder reasonably believes you will not be able to meet the repayment requirements under this Agreement due to a material change in your financial circumstances;

(C) You are in default of a material obligation of this Agreement or the Security Instrument; for purposes of this Agreement a material obligation will include without limitation your obligation to supply Holder with the credit and property information required under Section 10 of this Agreement;

(D) A governmental action prevents Holder from imposing the **ANNUAL PERCENTAGE RATE** or impairs Holder's security interest under the Security Instrument such that the value of the security interest is less than 120 percent of the Credit Limit;

(E) A regulatory agency has notified Holder that continued advances would constitute an unsafe practice;

(F) The **ANNUAL PERCENTAGE RATE** reaches the maximum rate permitted under this Agreement; or

(G) Any of you requests to do so; provided, that Holder may require that any such request be in writing and sent to Holder by certified mail, and that Holder may require that any request to reinstate the Account also be in writing and sent by all of you.

If Holder suspends the Account or reduces the Credit Limit, Holder will send you notice of Holder's decision as provided in Section 8 of this Agreement. Any request by you to reinstate the Account or the Credit Limit must be in writing and sent to Holder as provided in Section 8 of this Agreement.

## 16. CHANGING THE TERMS OF THIS AGREEMENT

Holder may not change the terms of this Agreement except under the following circumstances:

(A) Holder may change the Index and Margin if the original Index or any replacement index is no longer available. Any new Index must have a historical movement similar to the original Index and together with a new Margin must result in an **ANNUAL PERCENTAGE RATE** substantially similar to the **ANNUAL PERCENTAGE RATE** in effect at the time the original Index or replacement index became unavailable.

(B) Holder may make changes that you agree to in writing.

(C) Holder may make changes that unequivocally benefit you throughout the remaining term of the Account.

(D) Holder may make changes to insignificant terms of this Agreement.

Unless otherwise prohibited from doing so by applicable law, Holder may refuse to make additional Loans or reduce the Credit Limit whenever the Maximum **ANNUAL PERCENTAGE RATE** is reached.

## 17. CANCELING THE ACCOUNT

You may cancel the Account at any time by notifying Holder in writing as provided in Section 8 above. Cancellation of the Account by any of you will cancel the Account for all of you. However, Holder may release any of you from your obligations under this Agreement without releasing the remainder of you from your obligations.

If the Account is canceled or terminated for any reason, you will not be entitled to a refund of or a credit for any initial annual fees or other fees and charges payable under the Account, unless otherwise required by applicable law. In addition, you must return to Holder the Checks, and any other devices you may have to access the Account. Any

further use of such devices may be considered fraudulent. Regardless of such cancellation or termination, you will remain obligated to repay the Account Balance in full, including any money advanced to you after the Account has been canceled or terminated.

Cal State 9 Credit Union has agreed to credit you $ 1,962.00 towards non-reoccurring closing costs at the time of your Home Equity Line of Credit Account is opened provided your Account credit line amount is equal to or greater than $30,000 and your initial advance is equal to or greater than $10,000. **If you close your Home Equity Line of Credit Account in less than three years from the opening date, you will be required to reimburse Cal State 9 Credit Union for the $ 1,962.00 closing cost credit you initially received as a credit against the non-reoccurring closing costs.** The amount of the closing cost credit you receive will also be itemized on your HUD1 or HUD1A Estimated and Final Settlement Statement.

**18. LOAN CHARGES**

If this Agreement is subject to a law that sets maximum Loan charges, and that law is finally interpreted so that the **FINANCE CHARGE** or other Loan charges collected or to be collected in connection with the Account exceed the permitted limits, then: (a) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from you that exceeded permitted limits will be refunded to you. Holder may choose to make this refund by reducing the principal owed under the Account or by making a direct payment to you. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge. Your acceptance of any such refund made by direct payment to you will constitute a waiver of any right of action you might have arising out of such overcharge.

**19. SEVERABILITY**

In the event that any provision or clause of this Agreement or the Security Instrument conflicts with applicable federal, state, or local law, such provision or clause will be considered changed to the extent permissible and necessary to comply with such law. Otherwise, such conflict will not affect other provisions of this Agreement or the Security Instrument that can be given effect without the conflicting provision.

**20. YOUR BILLING RIGHTS-KEEP THIS NOTICE FOR FUTURE USE**

This notice contains important information about your rights and Holder's responsibilities under the Fair Credit Billing Act.

**Notify Holder In Case of Errors or Questions About Your Bill**

If you think the Billing Statement is wrong, or if you need more information about a transaction on the Billing Statement, write Holder at the address listed on the Billing Statement. Write to Holder as soon as possible. Holder must hear from you no later than 60 days after Holder sent you the first Billing Statement on which the error or problem appeared. You can telephone Holder, but doing so will not preserve your rights.
In your letter, give Holder the following information:

(A) Your name and account number.
(B) The dollar amount of the suspected error.
(C) Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized Holder to pay the Account automatically from your savings, checking, or other account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach Holder three business days before the automatic payment is scheduled to occur.

**Your Rights and Holder's Responsibilities After Holder Receives Your Written Notice**

Holder must acknowledge your letter within 30 days, unless Holder has corrected the error by then. Within 90 days, Holder must either correct the error or explain why Holder believes the Billing Statement was correct.

After Holder receives your letter, Holder cannot try to collect any amount you question or report you as delinquent. Holder can continue to bill you for the amount you question, including **FINANCE CHARGES**, and Holder can apply any unpaid amount against the Credit Limit. You do not have to pay any questioned amount while Holder is investigating, but you are still obligated to pay the parts of the Billing Statement that are not in question.

If Holder finds that Holder made a mistake on the Billing Statement, you will not have to pay any **FINANCE CHARGES** related to any questioned amount. If Holder did not make a mistake, you may have to pay **FINANCE CHARGES**, and you will have to make up any missed payments on the questioned amount. In either case, Holder will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that Holder thinks you owe, Holder may report you as delinquent. However, if Holder's explanation does not satisfy you and you write to Holder within ten days telling Holder that you still refuse to pay, Holder must tell anyone Holder reports you to that you have a question about the Billing Statement. And Holder must tell you the name of anyone Holder reported you to. Holder must tell anyone Holder reports you to that the matter has been settled between you and Holder when it finally is.

Case: 16-42900    Doc# 63-2    Filed: 07/11/18    Entered: 07/11/18 11:02:19    Page 33 of 40

If Holder does not follow these rules, Holder can't collect the first $50.00 of the questioned amount, even if the Billing Statement was correct.

## 21. COLLECTION COSTS

Holder may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us that amount. This includes, subject to any limits under applicable law, our attorneys' fees and our legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate an automatic stay or injunction), and appeals. You will also pay any court costs, in addition to all other sums provided by law.

## 22. DELAY IN ENFORCEMENT

Holder may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If holder delays or waives any rights, Holder may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of Holder's right to terminate your account in the future if you have not paid.

## 23. PREPAYMENT

Subject to paragraph 17, you may prepay all or any amount owing under this Account at any time without penalty, except Holder will be entitled to receive all accrued **FINANCE CHARGES**, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Account. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to Cal State 9 Credit Union, P.O. Box 271768, Concord, CA 94527-1768.

## 24. TAX CONSEQUENCES

You understand that neither Holder, nor any of Holder's employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Account, including the deductibility of interest, and that neither Holder nor Holder's employees or agents will be liable in the event interest on your Account is not deductible. You should consult your own tax advisor for guidance on this subject.

## 25. NOTIFY US OF INACCURATE INFORMATION

Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy should be sent to Holder at the address on your periodic billing statement.

## 26. GOVERNING LAW

This Agreement will be governed by and interpreted in accordance with federal law and the laws of the State of California. This Agreement has been accepted by us in the State of California.

## 27. CHOICE OF VENUE

If there is a lawsuit, you agree upon Holder's request to submit to the jurisdiction of the courts of Contra Costa County, State of California.

Case: 16-42900     Doc# 63-2     Filed: 07/11/18     Entered: 07/11/18 11:02:19     Page 34 of 40

## 28. ACKNOWLEDGEMENT

By signing this Agreement, you acknowledge that you have read this Agreement. By signing below, you agree to the terms and conditions of this Agreement. You also acknowledge and agree that you received a complete copy of this Agreement.

**NOTICE TO BORROWER**
**DO NOT SIGN THIS AGREEMENT/NOTE IF IT CONTAINS BLANK SPACES.**
**ALL SPACES SHOULD BE COMPLETED BEFORE YOU SIGN.**

*Tawana J. Devore*                          6/30/06
- BORROWER - TAWANA J. DEVORE - DATE -

*[Sign Original Only]*

Case: 16-42900    Doc# 63-2    Filed: 07/11/18    Entered: 07/11/18 11:02:19    Page 35
of 40

# EXHIBIT "3"

RECORDING REQUESTED BY:
Cal State 9 Credit Union

WHEN RECORDED MAIL TO:

Orion Financial Group, Inc.        oration
2860 Exchange Blvd. Ste 100
Southlake, TX 76092

CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
DOC- 2008-0150048-00

Check Number
Thursday, JUL 03, 2008 14:10:39
MOD    $2.00|REC    $6.00|FTC    $1.00
DAF    $1.80|REF    $0.20|RED    $1.00
Ttl Pd    $12.00         Nbr-0004137589
                         MNH/R0/1-2

REDACTED                        SPACE ABOVE THIS LINE FOR RECORDER'S USE

### ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned grants, assigns and transfers to: BOSCO CREDIT LLC, all beneficial interest under that certain Variable Interest Rate Revolving Line Of Credit Deed Of Trust dated June 29, 2006, executed by TAWANA J. DEVORE, Trustor(s), to Cal State 9 Credit Union as Trustee, and recorded July 11, 2006, as Instrument No. 2006-0217826-00 and of the Official Records in the office of the County Recorder of Contra Costa County, California, describing land therein as:

See Exhibit A-Legal Description attached hereto and made a part hereof.

And more commonly known as 3904 HIDDEN GROVE LANE, CONCORD, CALIFORNIA, 94519

TOGETHER with the Home Equity Line of Credit Agreement and Disclosure Statement or Notes therein described or referred to, together with all modifications thereto, the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

Dated  May 27, 2008                    Cal State 9 Credit Union

REDACTED

                                       By:  Sarah Leal
                                       HELOC Department Assistant Manager

STATE OF CALIFORNIA          )
COUNTY OF CONTRA COSTA )

On May 27, 2008 before me, Cherilyn D. G. Lewis, a Notary Public, personally appeared Sarah Leal, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal

Signature: _____ (seal)
Notary Name:                      Cherilyn D. G. Lewis
Notary Telephone Number:          925-363-2757
Notary Registration Number:       1541314
Notary Commission Expiration:     Jan. 3, 2009
Notary County-Principal place of business:  Contra Costa County

CHERILYN D.G. LEWIS
Commission # 1541314
Notary Public - California
Contra Costa County
My Comm. Expires Jan 3, 2009

REDACTED

## EXHIBIT A

All that certain real property in the City of Concord, County of Contra Costa, State of California, described as follows:

Lot 40 as shown on that certain Map entitled "Subdivision 8753, Hidden Grove", filed in the Office of the Recorder of the County of Contra Costa, State of California on August 20, 2004 in Book 468 of Maps, Pages 1 through 5, inclusive.

APN No: 114-033-053

END OF DOCUMENT

# EXHIBIT "4"

**POST-PETITION PAYMENT HISTORY**

| Case Name: | DEVORE |
|---|---|
| Case Number: | 16-42900 |
| Date Filed: | 10/18/2016 |

| Date | Description | Amount Paid | Amound Due | Suspense Balance |
|---|---|---|---|---|
| 10/20/16 | Post-Petition Payment Due | | $1,785.85 | |
| 11/20/16 | Post-Petition Payment Due | | $1,806.19 | |
| 12/20/16 | Post-Petition Payment Due | | $1,785.85 | |
| 1/20/17 | Post-Petition Payment Due | | $1,809.13 | |
| 2/20/17 | Post-Petition Payment Due | | $1,824.79 | |
| 3/20/17 | Post-Petition Payment Due | | $1,761.97 | |
| 4/20/17 | Post-Petition Payment Due | | $1,827.44 | |
| 5/20/17 | Post-Petition Payment Due | | $1,819.75 | |
| 6/20/17 | Post-Petition Payment Due | | $1,841.22 | |
| 7/20/17 | Post-Petition Payment Due | | $1,822.45 | |
| 8/20/17 | Post-Petition Payment Due | | $1,857.96 | |
| 9/20/17 | Post-Petition Payment Due | | $1,857.96 | |
| 10/20/17 | Post-Petition Payment Due | | $1,725.90 | |
| 11/20/17 | Post-Petition Payment Due | | $1,857.96 | |
| 12/20/17 | Post-Petition Payment Due | | $1,835.95 | |
| 1/20/18 | Post-Petition Payment Due | | $1,860.66 | |
| 2/20/18 | Post-Petition Payment Due | | $1,874.70 | |
| 3/20/18 | Post-Petition Payment Due | | $1,807.05 | |
| 4/20/18 | Post-Petition Payment Due | | $1,761.95 | |
| 5/20/18 | Post-Petition Payment Due | | $1,868.05 | |

| Total Received | Total Due |
|---|---|
| $0.00 | $36,392.78 |

| Total Arrears | $36,392.78 |
|---|---|